UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


LORRIE BECKER,                     )
                                   )
                Plaintiff,         )
                                   )
        v.                         )    No.  4:12CV82 FRB
                                   )
CAROLYN W. COLVIN, Acting          )
Commissioner of Social Security,[1] )
                                   )
                Defendant.         )


**MEMORANDUM AND ORDER**

        This cause is before the Court on plaintiff's appeal of
an adverse ruling of the Social Security Administration.  All
matters are pending before the undersigned United States Magistrate
Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

        On November 25, 2009, plaintiff Lorrie J. Becker filed
applications for Disability Insurance Benefits pursuant to Title II
of the Social Security Act, 42 U.S.C. §§ 401, et seq., and for
Supplemental Security Income pursuant to Title XVI of the Act, 42
U.S.C. §§ 1381, et seq., in which she claimed she became disabled
on January 1, 2009.  (Tr. 178-81, 182-88.)  On initial
consideration, the Social Security Administration denied
plaintiff's claims for benefits.  (Tr. 75, 76, 79-83.)  Upon

_____

        [1]On February 14, 2013, Carolyn W. Colvin became the Acting
Commissioner of Social Security.  Pursuant to Fed. R. Civ. P.
25(d), Carolyn W. Colvin is therefore automatically substituted for
former Commissioner Michael J. Astrue as defendant in this cause of
action.

plaintiff's request, hearings were held before an Administrative Law Judge (ALJ) on May 31, 2011, and August 25, 2011, at which plaintiff testified and was represented by counsel. A vocational expert also testified at the hearings. (Tr. 25-54, 55-68.) On September 13, 2011, the ALJ denied plaintiff's claims for benefits, finding plaintiff able to perform her past relevant work and, alternatively, that plaintiff could perform other work as it exists in significant numbers in the national economy. (Tr. 9-20.) On November 16, 2011, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-3.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

Plaintiff now seeks review of the Commissioner's final adverse determination arguing that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff claims that the ALJ rendered inconsistent conclusions regarding plaintiff's severe impairments and erred by failing to properly consider plaintiff's chronic pain syndrome and allegations of headaches and knee pain as severe impairments. Plaintiff also claims that the ALJ failed to fully and fairly develop the record in order to obtain medical evidence to support a determination as to plaintiff's residual functional capacity (RFC). Plaintiff asks the Court to reverse the decision of the Commissioner and render a fully favorable decision, or remand the matter for further proceedings.

Because the ALJ's decision in this cause is not supported by substantial evidence on the record as a whole, the matter should be reversed and remanded to the Commissioner for further proceedings.

## II.  Testimonial Evidence Before the ALJ

A.  <u>Hearing Held May 31, 2011</u>

1.  *Plaintiff's Testimony*

At the hearing on May 31, 2011, plaintiff testified in response to questions posed by the ALJ.

At the time of the hearing, plaintiff was fifty-one years of age.  Plaintiff lived in a home with her fiancé and three grandchildren whose ages were six, eight and ten.  Plaintiff earned a GED, participated in vocational rehabilitation, received training in electronics at a technical school, and attended a cosmetology school.  (Tr. 58-59.)

Plaintiff's Work History Report shows plaintiff to have worked as a sorter at the United States Postal Service from 1994 to 1998.  From 1996 to 2005, plaintiff worked as a sales associate at various retail stores.  From 2001 to 2006, plaintiff worked as a merchandising and marketing clerk at various wholesalers.  From August 2006 to October 2009, plaintiff worked as an office clerk at various businesses.  (Tr. 238.)

Plaintiff testified that she cannot work on account of her diagnosed conditions of fibromyalgia, Achilles tendinitis, carpal tunnel, and bulging discs in her back and neck.  Plaintiff

reported that she takes pain medication but has not undergone any surgery for her back or carpal tunnel conditions. (Tr. 61.)

Plaintiff testified that her fiancé worked full time, resulting in her sometimes being home alone with the grandchildren. Plaintiff testified that her son comes to help clean the house and care for the children four or five days a week. (Tr. 58.)

Plaintiff testified that that she was unaware as to why her medical records indicated a diagnosis of substance abuse. Plaintiff testified that she did not abuse her pain medication. (Tr. 61-62.) The ALJ determined to postpone the hearing so that additional evidence could be obtained and presented regarding allegations of substance abuse.

2.    *Testimony of Vocational Expert*

Dr. Gerald Belchick, a vocational expert, testified at the hearing in response to questions posed by the ALJ.

Dr. Belchick characterized plaintiff's past work as a merchandiser, office clerk, sales clerk, and sorter as light and semi-skilled. (Tr. 64-65.) It was determined that no further testimony would be obtained from Dr. Belchick until a supplemental hearing at which additional testimony from plaintiff would be adduced.

B.    Hearing Held on August 25, 2011

1.    *Plaintiff's Testimony*

At the hearing held on August 25, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

- 4 -

Plaintiff testified that she is the foster parent to her three grandchildren as determined by the Division of Family Services. (Tr. 29.)

Plaintiff testified that caring for her grandchildren causes her a lot of stress because such care is too exhausting for her by herself. Plaintiff testified that her son, fiancé and mother help her care for the children, but that her fiancé cannot be around the children when he is using drugs and her son cannot be around the children unsupervised because of his drug abuse problems. (Tr. 33-35.)

Plaintiff testified that she was previously hospitalized due to depression. (Tr. 53.)

Plaintiff testified that she experiences migraine headaches two or three times a week and that such headaches usually last one to two days but have sometimes lasted as long as a week. Plaintiff testified that medication taken for the condition helps most of the time, reducing her debilitation to only one day. Plaintiff testified that she is able to function when she has mild migraines. Plaintiff testified that she has severe migraines two or three times a month. (Tr. 39-40.) Plaintiff testified that she continues to care for her grandchildren during her migraine episodes and stays in bed while the children are at school. Plaintiff testified that if she cannot care for her grandchildren, she calls her fiancé home from work or her mother who lives a few minutes away. (Tr. 42.)

Plaintiff testified that she has fibromyalgia which causes her to have constant chronic pain all over her body. Plaintiff testified that she takes medication for the condition which helps. (Tr. 44.) Plaintiff testified that she performs physical therapy exercises. (Tr. 38.) Plaintiff testified that she has disturbed sleep in that she awakens at least two or three times a night. Plaintiff testified that she must keep changing positions while she sleeps. (Tr. 45.)

As to her exertional abilities, plaintiff testified that she can stand for half an hour and sit for three or fours hours as long as she can change positions. Plaintiff testified that she can walk for about twenty minutes. Plaintiff testified that she does not engage in any lifting but could probably lift about fifteen pounds. (Tr. 38-39.)

As to her daily activities, plaintiff testified that she wakes up at 4:30 or 5:00 a.m. to take her pain medication, and then goes back to sleep until 6:30 a.m. Plaintiff testified that she then makes coffee, wakes the children and gives them cereal for breakfast, and then walks them to the bus stop. Plaintiff testified that she then comes home and rests for about an hour. (Tr. 33-34, 36.) Plaintiff testified that she cares for her pets, consisting of two dogs and five cats. Plaintiff testified that she does laundry and some cooking. Plaintiff testified that she attends church and some of her grandchildren's school activities. Plaintiff testified that her hobbies include gardening. Plaintiff

testified that she drives.  (Tr. 36-38.)

    2.   *Testimony of Vocational Expert*

Dr. Belchick testified in response to questions posed by the ALJ and counsel.

Dr. Belchick characterized plaintiff's past work as a merchandiser, office clerk and sales clerk as light and semi-skilled; as a sorter as unskilled, medium as actually performed but light as generally performed; as a babysitter as medium and unskilled; and as a housekeeper as light and unskilled.  (Tr. 46-48.)

The ALJ then asked Dr. Belchick to assume an individual who was restricted to light work at the unskilled level to SVP 3; that such a person could not work in a setting that includes constant regular contact with the general public; and that such a person should not perform work that includes more than infrequent handling of customer complaints.  Dr. Belchick testified that such a person could perform plaintiff's past work as a merchandiser and as a house cleaner.  Dr. Belchick testified that such a person could perform other work as well, such as kitchen helper/ dishwasher, of which 2,000 such jobs exist locally and approximately 96,000 nationally; assembler, of which 2,200 such jobs exist locally and approximately 370,000 nationally; and packager, of which 2,300 such jobs exist locally and approximately 210,000 nationally.  (Tr. 48-50.)

In response to questions posed by counsel, Dr. Belchick

testified that unexcused absences from work two or three days a month is not an acceptable work practice and that employers would not hire a person with such absences.  (Tr. 51.)

### III.  Medical Records

On October 8, 2003, plaintiff was treated at Florissant Oaks for worsening anxiety.  Lorazepam[2] was prescribed.  (Tr. 701-02.)

In August and October 2005, plaintiff visited Dr. Mark A. Faron at Florissant Oaks with complaints of anxiety.  Zoloft[3] and Lorazepam were prescribed.  (Tr. 704-05.)

In November 2006, plaintiff visited Dr. Faron with complaints of neck pain after having sustained a fall.  Plaintiff was prescribed Cyclobenzaprine,[4] Propoxyphene[5] and ibuprofen.  (Tr. 708-09.)  In December 2006, plaintiff was referred for physical therapy for neck pain and cervical spine dysfunction.  (Tr. 710-11.)

---

[2]Lorazepam (Ativan) is used to relieve anxiety.  <u>Medline Plus</u> (last revised Oct. 1, 2010)<<u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html</u>>.

[3]Zoloft is used to treat depression, panic attacks, and social anxiety disorder.  <u>Medline Plus</u> (last revised Apr. 13, 2012) <<u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html</u>>.

[4]Cyclobenzaprine (Flexeril) is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries.  <u>Medline Plus</u> (last revised Oct. 1, 2010)<<u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html</u>>.

[5]Propoxyphene is used to relieve mild to moderate pain. <u>Medline Plus</u> (last reviewed Feb. 1, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682325.html>.

Plaintiff visited Dr. Faron on March 6, 2007, for follow up on anxiety. Plaintiff reported increased stress on account of her daughter. Plaintiff was prescribed Lorazepam. (Tr. 718-19.)

Plaintiff visited Dr. Faron on June 25, 2007, with complaints of pain in her back, neck and shoulder after having been involved in a motor vehicle incident. Plaintiff was diagnosed with muscle strain and was prescribed Cyclobenzaprine and ibuprofen. (Tr. 722-23.)

Plaintiff returned to Dr. Faron on August 30, 2007, with complaints of back pain radiating down the right leg. Plaintiff reported that she engages in a lot of lifting. Straight leg raising was positive on the right, and moderately reduced flexion of the spine and pelvis was noted. Plaintiff was diagnosed with sciatica and was instructed to rest and apply heat to the affected area. Vicodin[6] was prescribed. (Tr. 726-27.)

Plaintiff continued to complain of sciatic pain to Dr. Faron on September 11, 2007. Plaintiff also reported that her shoulders and left arm go numb. Plaintiff was prescribed Vicodin and Cyclobenzaprine. (Tr. 728-30.)

An MRI of the lumbar spine taken September 21, 2007, showed mild lumbar spondylosis. (Tr. 731.)

Plaintiff underwent a psychiatric evaluation at The

---

[6]Vicodin (hydrocodone) (also marketed under the brand name Norco) is a narcotic used to relieve moderate to severe pain. Medline Plus (last revised May 15, 2013)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html>.

Counseling Center at St. John's Mercy Health Care on January 7, 2008, upon referral by Dr. Faron. Plaintiff reported to Dr. Arturo C. Taca, Jr., that she had had panic disorder for about twenty years. Plaintiff reported having mood swings, irritability, trouble sleeping, and sometimes talking too fast. Plaintiff reported having a lot of stress due to significant family issues. Plaintiff's current medications were noted to include Ativan, Fioricet[7] and Albuterol. Mental status examination showed plaintiff's mood to be depressed and her affect constricted. Otherwise, examination was unremarkable. Dr. Taca diagnosed plaintiff with history of major depressive disorder, rule out bipolar affective disorder. A Global Assessment of Functioning Score (GAF) score of 40 was assigned.[8] Dr. Taca prescribed Klonopin[9] for plaintiff and referred her for psychotherapy. (Tr. 695-96, 699.)

---

[7]Fioricet is used to relieve tension headaches. Medline Plus (last revised Aug. 15, 2013)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601009.html>.

[8]A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000). A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family and is unable to work; child frequently beats up younger children, is defiant at home and is failing at school).

[9]Klonopin (Clonazepam) is used to relieve panic attacks. Medline Plus (last revised July 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html>.

Plaintiff returned to Dr. Taca on January 21, 2008, and reported a significantly improved mood upon taking Depakote.[10] Mental status examination was unremarkable. Plaintiff was diagnosed with history of major depressive disorder, rule out bipolar disorder; and a GAF score of 40 was assigned. Plaintiff was instructed to continue with Klonopin and Depakote and was referred for psychotherapy. (Tr. 698.)

Plaintiff returned to Dr. Taca on February 11, 2008, and reported that she was not doing well because of the recent loss of her brother. Plaintiff also reported a recent onset of migraine headaches. Upon examination, Dr. Taca diagnosed plaintiff with history of major depressive disorder, rule out bipolar affective disorder. Plaintiff was assigned a GAF score of 40. Plaintiff was instructed to continue with Klonopin and Depakote and was referred for psychotherapy. (Tr. 697.)

Plaintiff was admitted to the emergency room at St. John's Mercy Medical Center on February 22, 2008, with complaints of having a headache for three weeks. Plaintiff's history of migraine headaches was noted. Plaintiff reported being under increased stress with the recent loss of her brother. A CT scan of the head was normal. Plaintiff was given Toradol,[11] Reglan[12] and

---

[10]Depakote is used to treat mania in persons with bipolar disorder, and also to prevent migraine headaches. Medline Plus (last revised May 15, 2013)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html>.

[11]Toradol is used to relieve moderately severe pain. Medline Plus (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/

morphine[13] and was discharged that same date with reports that she felt better. Plaintiff's medications upon discharge included Percocet[14] and Reglan. (Tr. 466-82.)

Plaintiff visited Dr. Faron on March 11, 2008, and reported having headaches intermittently for about six weeks. It was noted that plaintiff was seeing a psychiatrist for anxiety disorder. Plaintiff's current medications were noted to include Topamax,[15] Vicodin and Clonazepam. Plaintiff was instructed to continue with her medication. (Tr. 738-39.)

An MRI of the brain and brain stem taken April 18, 2008, in response to plaintiff's complaints of migraine headaches yielded normal results. (Tr. 451.)

On April 28, 2008, plaintiff visited Dr. Faron complaining of having persistent, severe migraines for four months. Plaintiff also reported a four-month history of insomnia for which

---

medlineplus/druginfo/meds/a693001.html>.

[12]Reglan is used to relieve heartburn, nausea and vomiting. Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684035.html>.

[13]Morphine (MS Contin) is used to relieve moderate to severe pain. Medline Plus (last revised June 15, 2011) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682133.html>.

[14]Percocet (oxycodone) is a narcotic used to relieve moderate to severe pain. Medline Plus (last revised Apr. 15, 2013)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html>.

[15]Topamax is used to prevent migraine headaches. Medline Plus (last revised May 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697012.html>.

she had been prescribed Imipramine.[16]  Plaintiff was requesting refills of Vicodin and Compazine[17] inasmuch as she was going on vacation and needed the medication for her headaches.  Physical examination, including examination of the extremities, was normal.  Plaintiff was diagnosed with migraine headaches with associated nausea and was prescribed hydrocodone and Compazine.  (Tr. 343.)

Plaintiff returned to Dr. Faron on June 2, 2008, and complained of having chest pain for three weeks.  Physical examination, including examination of the extremities, was normal.  Plaintiff was diagnosed with migraine, generalized anxiety disorder, and recurrent depression.  Laboratory tests were ordered, and Duloxetine[18] was prescribed.  (Tr. 349-50.)

On June 23, 2008, plaintiff reported to Dr. Faron that she did not tolerate Cymbalta.  It was noted that plaintiff had not received any psychiatric care recently.  Plaintiff's current diagnoses were noted to include allergic rhinitis, asthma, migraine, sciatica, headache, and generalized anxiety disorder.

---

[16]Imipramine (Tofranil) is used to treat depression.  Medline Plus (last revised Feb. 15, 2013)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682389.html>.

[17]Compazine (Prochlorperazine) is used to control severe nausea and vomiting, as well as to treat anxiety on a short-term basis.  Medline Plus (last revised May 16, 2011)<http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a682116.html>.

[18]Duloxetine (Cymbalta) is used to treat depression and generalized anxiety disorder; pain caused by fibromyalgia; and ongoing bone or muscle pain such as lower back pain or osteoarthritis.  Medline Plus (last revised Feb. 15, 2013)<http: //www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html>.

Plaintiff denied any current chest pain. Physical examination was unremarkable. Plaintiff was also noted to have normal mood and affect. Plaintiff was referred to psychiatry. (Tr. 355-57.)

Plaintiff visited psychiatrist Dr. Steven Harvey on July 1, 2008, and reported being moody and having crying spells. Plaintiff reported that she has had mood problems her entire life. Plaintiff reported that she liked her job. Plaintiff reported that she travels to Arizona to visit her boyfriend's mother, and that she likes to visit places. Dr. Harvey noted plaintiff to be pleasant and cooperative, with normal speech and logical flow of thought. Plaintiff denied hallucinations or delusions and had no suicidal or assaultive ideations. Plaintiff was fully oriented and had intact long term and short term memory. Plaintiff was noted to be anxious, mostly euthymic and stable. Plaintiff's insight and judgment were noted to be fair. Dr. Harvey diagnosed plaintiff with bipolar disorder-mixed, and a GAF score of 65 was assigned.[19] Dr. Harvey noted plaintiff's current medications to include Klonopin, Imipramine and Cyclobenzaprine. Dr. Harvey instructed plaintiff to continue with her medications, and Lamictal[20] was

---

[19]A GAF score of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).

[20]Lamictal is used to increase the time between episodes of depression and mania in persons with bipolar disorder. Medline Plus (last revised Feb. 1, 2011)<http://www.nlm.nih.gov/

prescribed. Therapy was considered. Plaintiff was instructed to return for follow up in three weeks. (Tr. 566-68.)

On July 22, 2008, plaintiff reported to Dr. Harvey that she did not start the Lamictal as prescribed but was feeling a lot better and her mood was okay. Plaintiff reported that she was hesitant to start the Lamictal when she felt fine. Plaintiff reported that she continued to smoke marijuana and did not see a problem with it. Mental status examination was unremarkable. Plaintiff was noted to be more euthymic and stable. It was determined that plaintiff would start Lamictal at a later time. Dr. Harvey continued in his diagnosis and GAF score of 65, instructed plaintiff to stop using marijuana, and further instructed that plaintiff continue with her other medications. (Tr. 564-65.)

Plaintiff returned to Dr. Faron on August 19, 2008, and complained of having headaches and diarrhea associated with stress. It was noted that plaintiff was scheduled to see her psychiatrist on September 2, 2008. Plaintiff reported being depressed, nervous and anxious. Plaintiff's mood and affect were noted to be normal. Plaintiff was diagnosed with gastroenteritis, asthma, generalized anxiety disorder, and migraine. It was noted that plaintiff's headaches could be related to stress, and plaintiff was instructed to discuss this with her psychiatrist. Prochlorperazine and Vicodin were prescribed. (Tr. 363-65.)

---

medlineplus/druginfo/meds/a695007.html>.

Plaintiff returned to Dr. Harvey on September 2, 2008, and reported that she was having problems and had been crying for four days. It was noted that plaintiff's daughter continued to use drugs and that plaintiff's son had just been laid off. Mental status examination was unremarkable. Plaintiff was instructed to start Lamictal. (Tr. 563.)

On September 8, 2008, plaintiff reported to Dr. Faron that she had been experiencing bilateral ankle and foot pain for six weeks, and intermittent left forearm pain for years. It was noted that plaintiff had seen Dr. Harvey and was prescribed Lamictal. Physical examination was unremarkable. Plaintiff was referred to orthopedic surgery for evaluation of possible osteo-arthritis. (Tr. 371-73.)

Plaintiff visited Dr. Craig Aubuchon on September 25, 2008, with complaints of left knee pain and bilateral pain in the ankles and across the midfoot. Plaintiff reported that her kneecap gives out occasionally and that she sits most of the time at work because of knee swelling and pain in her foot when she walks. It was noted that plaintiff's medications included Clonazepam, Imipramine, aspirin, Cyclobenzaprine, Lamictal, and Albuterol. Dr. Aubuchon noted plaintiff's medical history to include emphysema, reflux, irritable bowel, depression/bipolar, thyroid disease, degenerative arthritis, and headaches. Physical examination showed plaintiff to appear very healthy and to walk with a normal heel-to-toe gait. Slight tenderness and effusion were noted along the

lateral joint line of the left knee, with grinding noted upon range of motion. Tenderness was also noted over the patellar tendon. Normal strength was noted along the hamstrings and quad. No swelling was noted about plaintiff's ankles or feet, but tenderness was noted along the tarsometatarsal joints. Tenderness was noted about the heel cords as well. Sensation was intact. X-rays of the knee were unremarkable. X-rays of the feet showed degenerative changes of the midfeet. Dr. Aubuchon diagnosed plaintiff with Achilles tendinitis and chondromalacia of the left foot causing effusion. Plaintiff was instructed to participate in physical therapy and to obtain orthotics to control her midfoot and lessen the stress. Plaintiff was instructed to return in three to four weeks. (Tr. 335-36.)

Plaintiff returned to Dr. Harvey on September 30, 2008, who could not determine whether plaintiff was better. Plaintiff reported that it takes her three hours to leave the house because of low energy and low motivation. Plaintiff reported that she had more anxiety and that her headaches were worsening. Plaintiff reported being tired of the pain. Dr. Harvey continued in his diagnosis of plaintiff and instructed her to continue on her current medication regimen. (Tr. 561-62.)

On October 16, 2008, plaintiff went to the emergency room at St. John's Mercy Medical Center with complaints of migraine headaches with associated vomiting and chest pain. Plaintiff rated her pain to be at a level ten on a scale of one to ten. Plaintiff

was given Compazine, Benadryl and Dilaudid.[21]  Upon discharge, plaintiff was prescribed Vicodin.  Plaintiff was released to return to work on October 19, 2008, with no restrictions.  (Tr. 483-99.)

Plaintiff returned to Dr. Aubuchon on October 23, 2008, and complained of pain in her left shoulder radiating down the forearm.  Plaintiff also complained of pain in the left greater trochanter with discomfort and pain upon sitting and upon lying on her left side.  Plaintiff reported having such pain for several months.  Physical examination showed limited range of motion about the left hip with tenderness over the greater trochanter.  No swelling was noted, and plaintiff had normal strength about the hip flexors.  Plaintiff had full range of motion about the shoulder with no tenderness.  Positive impingement test was noted, however, as well as weakness to supraspinatus testing.  Plaintiff had full range of motion about her elbow.  X-rays of the left hip, arm and forearm were normal.  Dr. Aubuchon diagnosed plaintiff with rotator cuff tendinitis over the left shoulder and bursitis of the left hip over the greater trochanter.  Steroid injections of Depo-Medrol were administered and plaintiff was instructed to return in one month.  It was noted that plaintiff was participating in physical therapy for her lower extremity.  (Tr. 334.)

On October 31, 2008, plaintiff reported to Dr. Harvey that she was good and that things had improved over the previous

---

[21]Dilaudid is a narcotic used to relieve moderate to severe pain.  <u>Medline Plus</u> (last revised Aug. 15, 2013)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682013.html>.

couple of weeks. Mental status examination was normal. Dr. Harvey continued in his diagnosis of bipolar disorder-mixed and assigned a new GAF score of 80.[22] Plaintiff was instructed to continue with her current medications and to return in four weeks for follow up. (Tr. 560.)

Plaintiff returned to Dr. Aubuchon on November 20, 2008, and complained of continued pain in her left hip and of pain in her back. Straight leg raising was positive bilaterally for radiating pain. Dr. Aubuchon noted limited range of motion with flexion and extension. Plaintiff had diminished reflexes in the knees and ankles. Sensation was intact. Range of motion about the hips was noted to be nontender. Dr. Aubuchon diagnosed plaintiff with back pain suggestive of sciatica. Physical therapy for the condition was prescribed. (Tr. 333.)

On December 8, 2008, plaintiff visited Dr. Faron and reported that she was participating in physical therapy for her back. Physical examination was unremarkable. Plaintiff's migraine headaches were noted to be controlled with medication, and Vicodin was prescribed. Plaintiff's asthma condition was also noted to be controlled with medication. Plaintiff was prescribed Cyclobenzaprine for sciatica and was instructed to continue with

_____

[22]A GAF score of 71-80 indicates transient symptoms and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument) or no more than slight impairment in social, occupational or school functioning (e.g., temporarily falling behind in schoolwork). Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).

physical therapy.  (Tr. 385-88.)

On December 18, 2008, plaintiff reported to Dr. Aubuchon that she continued to have back pain and had right knee pain.  Dr. Aubuchon noted plaintiff's left shoulder pain to have improved after the injection.  Physical examination of the right knee showed only slight tenderness over the medial joint line and grinding with patellofemoral range of motion.  Dr. Aubuchon noted x-rays to show a little medial joint space narrowing of the right knee.  Dr. Aubuchon opined that plaintiff may have a degenerative meniscal tear suggestive of chondromalacia.  Dr. Aubuchon ordered an MRI of plaintiff's knee and instructed plaintiff to continue with physical therapy for her back and shoulder.  Vicodin was prescribed.  (Tr. 332.)

On January 8, 2009, Dr. Aubuchon noted the recent MRI to show a bucket handle tear of the medial meniscus.  Physical examination showed significant tenderness at the medial joint line with a reproduction of symptoms with McMurray's test.  Plaintiff had normal strength of the quads and hamstrings and walked with a normal gait.  Surgical repair by medial arthroscopy was planned. (Tr. 331.)

Plaintiff visited Dr. Harvey on January 20, 2009, and reported that she was doing okay.  It was noted that plaintiff had run out of her medications.  Mental status examination was normal. Dr. Harvey continued in his diagnosis of bipolar disorder-mixed and continued his GAF score of 80.  Plaintiff was instructed to restart

her medications and to continue with Lamictal. (Tr. 559.)

On March 5, 2009, Dr. Aubuchon noted plaintiff to be ten days post-op. Examination showed plaintiff able to obtain almost full extension of the right knee. The knee was noted to feel stable. Physical therapy was ordered. An x-ray of the right knee taken that same date showed good cartilage height at both the medial and lateral joint lines. (Tr. 329, 330.) On March 26, 2009, plaintiff reported continued improvement with her right knee but requested additional pain medication. Mild tenderness was noted about the medial joint line, with no crepitus upon patellofemoral range of motion. Slight effusion was noted to be present. Plaintiff also reported being under a marked amount of stress due to family issues. A refill of pain medication was given and plaintiff was instructed as to continued rehabilitative treatment. (Tr. 328.)

On April 14, 2009, Darvocet[23] was prescribed for plaintiff. (Tr. 327.) On April 15, 2009, plaintiff reported to Dr. Aubuchon's office that Darvocet did not control her pain. Norco was prescribed. (Tr. 326.)

On April 21, 2009, plaintiff reported to Dr. Aubuchon that she had chronic back pain which awakens her at night. Plaintiff complained of knee pain, aggravated by stepping in a hole. Examination showed slight effusion and diffuse tenderness

_____

[23]Darvocet is used to relieve mild to moderate pain. Medline Plus (last revised Mar. 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601008.html>.

about the right knee. A steroid injection of Depo-Medrol was administered to the knee. Plaintiff requested pain medication, and her prescription for Vicodin was renewed. (Tr. 325.)

On April 21, 2009, plaintiff visited Dr. Daniel Sohn at Mid County Orthopaedic Surgery and Sports Medicine upon referral from Dr. Aubuchon. Plaintiff complained of severe back, neck, shoulder, and arm pain. Physical examination showed plaintiff's stance, gait and position changes to be normal. Plaintiff had limited range of motion about the back due to stiffness. Tenderness to palpation was noted along the left L-4 spinous process and in the left gluteus muscle. Lower extremity strength was intact, and straight leg raising was negative. Dr. Sohn diagnosed plaintiff with low back pain related to facet irritation and left gluteal myofascial pain. Plaintiff was prescribed Soma[24] and Mobic[25] and was instructed to remain active with her usual activities. (Tr. 689-90.)

Plaintiff returned to Dr. Faron on April 23, 2009, with complaints relating to acute bronchitis. It was noted that plaintiff was seeing Dr. Sohn for pain management and Dr. Aubuchon for orthopaedic issues. No other complaints were noted. (Tr. 394-

---

[24]Soma is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. Medline Plus (last reviewed Aug. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682578.html>.

[25]Mobic is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601242.html>.

96.)

On May 27 and June 8, 2009, Dr. Aubuchon refilled plaintiff's prescription for Vicodin. (Tr. 323, 324.)

On June 1, 2009, plaintiff returned to Dr. Faron with complaints relating to acute sinusitis and nausea. No other complaints were reported. (Tr. 402-03.) During follow up on June 8, 2009, it was noted that plaintiff's migraine and asthma conditions were controlled. Plaintiff was instructed to follow up with psychiatry regarding generalized anxiety disorder. (Tr. 408-10.)

During follow up examination on June 9, 2009, Dr. Aubuchon noted plaintiff to be doing pretty well. Plaintiff was instructed to continue with her exercises and to return on an as needed basis. (Tr. 322.)

A bone density scan performed June 12, 2009, yielded normal results. (Tr. 411-12.)

On June 17, 2009, plaintiff visited Dr. Sohn with complaints of longstanding pain in her back, neck and shoulder. Plaintiff reported having poor sleep because of her low back pain. Plaintiff reported having taken Vicodin for her pain, which was prescribed by Dr. Aubuchon for her knees, but that she no longer sees Dr. Aubuchon because of her resolved knee condition. Plaintiff reported that she currently takes Mobic and that taking Soma did not really help her pain. Examination of the back showed limited range of motion. Tenderness to palpation was noted

diffusely about the low back, shoulder girdle, neck, elbows, and knees. Plaintiff also reported upper extremity numbness and tingling in her hands. Results of nerve conduction studies were consistent with mild left carpal tunnel syndrome. Dr. Sohn noted plaintiff's diffuse muscle pain to be consistent with fibromyalgia. Flexeril was prescribed. Plaintiff was instructed to continue with physical therapy for her neck, shoulder girdle and back; and a referral was made for carpal tunnel syndrome. (Tr. 321.)

On July 7, 2009, plaintiff visited Dr. David W. Strege upon referral for her complaints relating to carpal tunnel syndrome. Plaintiff complained of intermittent pain and numbness in the hands, wrists and forearms. Plaintiff reported that wearing wrist splints did not help the condition. Dr. Strege noted plaintiff's past medical history to include anxiety, depression, bipolar disorder, and low back problems. It was also noted that plaintiff had recently been diagnosed with fibromyalgia. Upon physical examination, Dr. Strege determined that plaintiff had symptoms consistent with mild left carpal tunnel syndrome but noted that such symptoms were not overly impressive. Dr. Strege also opined that plaintiff's symptoms could be resulting from fibromyalgia. An injection of Celestone and Lidocaine was administered to the left carpal tunnel, and plaintiff was instructed to return for follow up in four weeks. (Tr. 319-20.)

Plaintiff returned to Dr. Harvey on July 7, 2009, who noted plaintiff's mood to be a lot more stable. Plaintiff reported

that she cries a lot because she is in so much pain. Mental status examination was unremarkable. Plaintiff was instructed to continue with her current medications and to return in three months for follow up. Participation in psychotherapy was recommended. (Tr. 558.)

On July 12, 2009, plaintiff went to the emergency room at St. John's with complaints of migraine headaches and of pain in her back and neck. Plaintiff reported having taken her last Vicodin in the morning and that her doctor had not yet provided a new prescription. Plaintiff was given Toradol, Compazine, Reglan, and Dilaudid and was discharged that same date. Vicodin was prescribed upon discharge. (Tr. 500-15.)

Plaintiff returned to Dr. Faron on July 13, 2009, and reported that she went to the emergency room the previous evening due to migraine headaches. Plaintiff reported that she hurt all over and was frustrated. Plaintiff also reported that she was depressed and that she was instructed by her psychiatrist to restart Imipramine. Plaintiff reported having radiating pain in her hips, back and legs as well as pain in her ankles and heels. It was noted that plaintiff wore splints for carpal tunnel syndrome. Examination of the musculoskeletal system showed no point tenderness or edema. Plaintiff was noted to be seeing Dr. Sohn for sciatica and Dr. Harvey for major depression. Plaintiff's symptoms of arthralgia were opined to be related to her depression, and plaintiff was encouraged to follow up with Dr. Harvey. (Tr.

420-21.)

On September 2, 2009, plaintiff visited Florissant Oaks and reported having had moderate migraine headaches for three or four days. Plaintiff reported that hydrocodone was the only medication that helped her condition. Plaintiff reported being unhappy with her pain management physician and that she was not going to see him anymore. Physical examination was unremarkable. Plaintiff refused prescriptions for Medrol DosePack and Tramadol, stating that the medications did not work. Plaintiff was advised to continue with pain management. A possible referral to rheumatology was considered as well as possible re-evaluation by a neurologist, but plaintiff expressed concern regarding costs. Plaintiff was instructed to follow up in December. (Tr. 426-27.)

On September 17, 2009, plaintiff reported to Dr. Harvey that she was under a lot of stress. Plaintiff reported that she had been doing pretty well but that her daughter was leaving soon to go to prison. Dr. Harvey instructed plaintiff to increase her dosage of Klonopin and to continue with her other medications as prescribed. Plaintiff was assigned a GAF score of 70 and was instructed to return in six weeks for follow up. Participation in psychotherapy was recommended. (Tr. 556-57.)

Plaintiff visited Dr. Gary Gray from Dunn Physician Offices on September 22, 2009, who noted plaintiff to have widespread pain syndrome. Dr. Gray noted there to be no clear diagnosis and opined that her condition was most likely

- 26 -

fibromyalgia syndrome.  Plaintiff currently complained of problems with her hands and feet.  Dr. Gray noted plaintiff's routine doctor's visits to yield normal examinations.  Current physical examination was unremarkable.  Plaintiff was diagnosed with sciatica and fibromyalgia, and ibuprofen and Lyrica[26] were prescribed.  (Tr. 544-49.)

Plaintiff returned to Dr. Gray on October 9, 2009, with complaints of back pain radiating to the side and hips, muscle pain, and foot and ankle pain.  Plaintiff reported ibuprofen and Darvocet not to help, but that hydrocodone helped.  Dr. Gray prescribed hydrocodone for plaintiff, noting the medication to be effective and to be prescribed in good faith to treat a chronic pain condition.  (Tr. 551-52.)

On October 28, 2009, plaintiff was admitted to the emergency room at St. John's after having cut her finger on a glass.  Plaintiff also complained of pain all the way up her arm with passive motion.  It was questioned whether there was possible tendon injury.  Plaintiff's current medications were noted to include Percocet, Vicodin, Flexeril, Motrin, Klonopin, Lamictal, and Tofranil. Physical examination showed plaintiff's left hand to have decreased range of motion and tenderness as well as laceration, but plaintiff was observed to exhibit normal two-point discrimination, normal capillary refill, no deformity, no swelling,

_____

[26]Lyrica is used to relieve neuropathic pain and fibromyalgia. Medline Plus (last revised Sept. 1, 2009)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a605045.html>.

and normal sensation. Plaintiff requested that she be given Percocet, stating that Vicodin did not help her pain. Plaintiff's finger was stitched and plaintiff was discharged that same date. (Tr. 441-49.)

On October 30, 2009, plaintiff continued to complain of pain and immobility in her left finger. Dr. Michael Smock scheduled surgery for the following week. (Tr. 517.)

Plaintiff visited Dr. Gray on November 6, 2009, with complaints of back pain and ankle/foot pain. Plaintiff reported that hydrocodone was only minimally helpful but that oxycodone taken post-surgery seemed to provide some relief. It was noted that plaintiff's asthma condition appeared stable. Plaintiff was instructed to follow up with Dr. Sohn to explore other long-term medication options regarding her chronic pain. Dr. Gray noted that all options he was comfortable with prescribing had been exhausted. (Tr. 529-33.)

On November 13, 2009, Dr. Smock noted plaintiff's left finger condition to be consistent with rupture of both flexor tendons. Additional surgery was scheduled. (Tr. 519.)

On November 20, 2009, Dr. Smock noted plaintiff to complain of increased pain. Plaintiff's finger was noted to be a little red and swollen. Plaintiff's prescription for Percocet was refilled. (Tr. 520.) On November 23, 2009, plaintiff complained to Dr. Smock of severe pain. Mild swelling was noted. Plaintiff was instructed to follow up with hand therapy. (Tr. 518.) On

November 24, 2009, Dr. Smock noted the swelling to have improved and that plaintiff's finger looked okay.  Noting plaintiff to take about eight Percocet a day, plaintiff's prescription for Percocet was refilled.  (Tr. 521.)

Plaintiff returned to Dr. Smock on December 1, 2009, and continued to complain of severe pain.  It was noted that plaintiff had not yet undergone hand therapy as prescribed.  Plaintiff also reported that she had severe shoulder and knee pain after having sustained a fall.  Plaintiff's prescription for Percocet was refilled.  (Tr. 522.)

Plaintiff visited Dr. Gray on December 2, 2009, and complained of pain in her neck, wrist and back after having slipped.  Plaintiff reported that Dr. Sohn had nothing left to offer her but more physical therapy for her chronic pain.  It was noted that there was no clear etiology for plaintiff's chronic pain syndrome.  (Tr. 536-37.)  Dr. Gary concluded:

> I am not willing to provide more potent narcotics as this is deferred to her pain management doctor.  She is planning to pursue disability.  I feel she meets criteria from a psychiatric standpoint.  I don't think she is emotionally [c]apable of any meaningful employment.  I cannot in good faith give more potent pain treatment as there is NOTHING to support an organic [c]ause of her chronic pain.  She certainly may have acute pain from the fall warranting short term disability, but she is on appropriate narcotic therapy from her hand surgeon.

(Tr. 537.)

Plaintiff visited St. John's Mercy Sports & Therapy on December 8, 2009, for initial evaluation regarding hand therapy. It was determined that plaintiff would participate in therapy three times a week for four weeks. (Tr. 686-87.)

Plaintiff returned to Dr. Harvey on December 10, 2009, who noted plaintiff to have a lot of stressors, including her daughter being in prison, her alcoholic son having recently been involved in a motor vehicle accident, her recent tendon injury, and her anticipated loss of insurance. Dr. Harvey noted plaintiff to be doing better with mood stabilizers but opined that plaintiff needed therapy. Plaintiff was instructed to continue with her same medication and to return in two months. It was noted that a therapist would be sought out once plaintiff's insurance status was known. (Tr. 555.)

Plaintiff visited Dr. Gray on December 24, 2009, who noted plaintiff to be a chronic pain sufferer with complaints of neck pain, low back pain, and generalized fibromyalgia-type pain. It was noted that plaintiff had seen a number of specialists and had tried a number of medications, all of which were unsuccessful in relieving her pain. Dr. Gray noted plaintiff to be desperate and pleading for someone to help her. Physical examination showed tenderness to palpation along paraspinal muscles but was otherwise unremarkable. Plaintiff was observed to be in mild distress. Dr. Gray diagnosed plaintiff with cervicalgia, lumbar spondylosis and

migraine headaches and prescribed MS Contin, Percocet and Maxalt.[27] (Tr. 680-85.)

Plaintiff visited Dr. Gray on February 4, 2010, for follow up on pain management. Dr. Gray noted plaintiff to have chronic neck/back/arm/leg pain and fibromyalgia-type syndrome of unclear etiology, but that plaintiff's current medications have been very effective and have provided plaintiff the best quality of life that she has had in quite some time. Plaintiff's current medications were noted to include MS Contin, Percocet, Maxalt, Lamictal, Tofranil, Motrin, and Klonopin. Dr. Gray noted plaintiff to be more calm, comfortable and pleasant than ever before. Dr. Gray described plaintiff as a "new person," having obtained clear benefit from a more potent and reasonable pain management regimen. Plaintiff was instructed to continue on her current medications and to return in one month for follow up. (Tr. 674-79.)

An x-ray of plaintiff's chest taken February 4, 2010, yielded normal results. A pulmonary function test performed that same date in response to plaintiff's complaints of shortness of breath yielded essentially normal results, with evidence of a minimal obstructive ventilatory defect with a moderate diffusion abnormality. (Tr. 574, 575.)

On March 15, 2010, plaintiff visited Dunn Physician Offices after having been involved in a motor vehicle accident

---

[27]Maxalt is used to treat the symptoms of migraine headaches. Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601109.html>.

three days prior.  Plaintiff complained of hip and back pain.  It was noted that plaintiff walked with a cane.  It was noted that plaintiff had pre-existing pain issues with fibromyalgia and was chronically taking MS Contin with some Percocet.  Physical examination currently showed limited range of motion about the hip due to pain.  Plaintiff was diagnosed with chronic pain disorder with fibromyalgia, requiring high potency narcotics; and worsening right hip and back pain due to a recent motor vehicle accident.  Plaintiff was instructed to temporarily increase her dosage of Percocet due to her recent injury.  (Tr. 666.)

On April 27, 2010, plaintiff visited Dr. Harvey and reported that her daughter had recently passed away due to acute morphine intoxication.  Plaintiff was noted to be very sad and very depressed.  Plaintiff reported that she was off of all of her medications except for Klonopin.  Mental status examination was normal.  Plaintiff was instructed to continue with Klonopin and to restart Lamictal.  Plaintiff was also instructed to restart therapy soon.  A GAF score of 70 was assigned.  (Tr. 582.)

Plaintiff visited Dunn Physician Offices on April 6, 2010, for follow up of low back pain and hip pain related to the motor vehicle accident.  Tenderness was noted about the lumbar back.  Percocet and Compazine were prescribed, and plaintiff was referred to physical therapy.  (Tr. 662-63.)

Plaintiff visited Dunn Physician Offices on May 3, 2010, and complained of arm tingling and numbness relating to the motor

vehicle accident. Plaintiff also complained of increased low back and leg pain. It was noted that plaintiff was leaving for a trip to Arizona to help her boyfriend "take care of things" after the death of his mother. Plaintiff requested an increase in her pain medications. Tenderness was noted along the neck to the shoulders bilaterally. Plaintiff was also noted to have a limping gait. An MRI of the cervical spine was ordered, and a referral to physical therapy was made. Lamictal and Compazine were prescribed. Plaintiff was instructed to continue with her current dose of MS Contin and was advised to increase her Percocet if necessary during the trip. (Tr. 653-54.)

On May 13, 2010, Stanley Hutson, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form (PRTF) in which he opined that plaintiff's bipolar disorder resulted in mild restrictions of plaintiff's daily activities, and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (Tr. 583-94.) In a Mental RFC Assessment completed that same date, Dr. Hutson opined that plaintiff had no significant limitations in the domain of Understanding and Memory. In the domain of Sustained Concentration and Persistence, Dr. Hutson opined that plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, in her ability to work in coordination with or proximity to others without being distracted by them, and in her ability to complete a normal workday and

workweek without psychologically-based interruptions, but otherwise was not significantly limited. In the domain of Social Interaction, Dr. Hutson opined that plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors, and in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but otherwise had no significant limitations. Finally, in the domain of Adaptation, Dr. Hutson opined that plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, but otherwise was not significantly limited. (Tr. 595-97.) Dr. Hutson concluded that plaintiff had "the ability to understand and remember instructions. She can remember work procedures and can follow instructions to complete fairly complex activities. She could cope with a low stress work setting that has few social demands." (Tr. 597.)

On June 7, 2010, plaintiff reported to Dr. Gray that she obtained extensive relief with the current pain management protocol. Dr. Gray noted the pain medication to be effective. Medrol Dosepack[28] and Percocet were prescribed. (Tr. 646.)

On July 19, 2010, plaintiff reported to Dr. Gray that she had rib pain and limited range of motion about the left shoulder as

_____

[28]Medrol is used to relieve inflammation and to treat certain forms of arthritis and asthma. Medline Plus (last reviewed Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795.html>.

the result of a recent fall, and that her current pain medication did not control the related pain. Motrin and Medrol were prescribed. (Tr. 642.)

Plaintiff visited Dr. Gray on October 14, 2010, who noted plaintiff to be living with her fiancé and three grandchildren. It was noted that the children were struggling emotionally with the recent death of their mother, were undergoing counseling, and acting out. It was also noted that they were doing well in school. Plaintiff reported her symptoms of depression and anxiety to have worsened since she stopped taking Lamictal, but that she was scheduled to see Dr. Kabir that day. Plaintiff also reported the chronic pain in her legs to continue and that she could stand for about fifteen minutes. It was noted that there had been some improvement in the symptoms. Examination was unremarkable. Dr. Gray diagnosed plaintiff with leg pain, cervicalgia and fibromyalgia and prescribed MS Contin and Percocet. (Tr. 636.)

Plaintiff visited Dunn Physician Offices on October 26, 2010, and complained of migraines, worsening aches in her joints and muscles, fatigue, and bruising. Plaintiff's prescription for Flexeril was refilled, and Prednisone was prescribed. Laboratory tests were ordered. (Tr. 623-24.)

On November 22, 2010, plaintiff visited Multi-Specialty Mental Health Service (MMHS) for a psychiatric evaluation. Plaintiff reported being more angry during the previous eight months, having lost her daughter to overdose. No learning disorder

or other sign of mental or physical disorder was observed. Plaintiff was noted to be taking Lamictal and Klonopin. It was noted that plaintiff had had a physical examination within the past year and that everything was okay. It was noted that plaintiff was taking Percocet. As to her social history, plaintiff reported that she takes care of kids, goes out, and had a best friend who died. Mental status examination showed plaintiff to have a cooperative attitude but to speak fast and angrily. Plaintiff's mood was noted to be angry, frustrated and irritable, and her affect was broad. Plaintiff's thought processes, memory and judgment were noted to be fair. Plaintiff's concentration and insight were noted to be poor. Plaintiff was considered to have average intellect. Plaintiff was diagnosed with bipolar disorder-depressed-moderate and was assigned a GAF score of 60.[29] It was recommended that plaintiff participate in cognitive behavioral therapy. (Tr. 753-756.)

On November 23, 2010, plaintiff visited Dr. Gray regarding her generalized pain/fibromyalgia. Dr. Gray noted plaintiff's quality of life to have clearly improved with the treatment plan. It was noted that the pain medication was effective. Plaintiff denied any symptoms of depression. Examination was unremarkable. Plaintiff was diagnosed with

---

[29]A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).

generalized anxiety disorder, cervicalgia and fibromyalgia and was instructed to continue on the current treatment plan. (Tr. 617.)

Plaintiff returned to MMHS on November 30, 2010, for therapy. It was noted that plaintiff's mood, sleep, and thought processes were fair. Plaintiff reported having no motivation or energy. Plaintiff was instructed to return in two months. (Tr. 757.)

Plaintiff visited Dr. Gray on February 23, 2011, who noted plaintiff's back pain to be a chronic, intermittent problem but that effective narcotic pain medication provided good results and improved plaintiff's quality of life. Dr. Gray also noted that plaintiff tolerated the medication for her headache condition and experienced no side effects. Plaintiff's anxiety was noted to be stable without the use of Clonazepam. (Tr. 606-07.)

Plaintiff visited Dr. Marketa Kasalova at Dunn Physician Offices on March 28, 2011, with complaints of jaw pain after a dental extraction. Plaintiff also reported having headaches. It was noted that plaintiff had been diagnosed with leg pain, cervicalgia, fibromyalgia, and dental pain — all for which she was prescribed Percocet. (Tr. 599-603, 767-68.)

Plaintiff visited Dr. Kasalova on June 6, 2011, with complaints of worsening low back pain and neck pain. Plaintiff reported the pain to radiate into her legs. Plaintiff also reported numbness in her left arm. Plaintiff denied having headaches or chest pain. Physical examination was unremarkable.

Plaintiff had normal range of motion about the neck. Plaintiff was diagnosed with cervicalgia, sciatica, fibromyalgia, lumbar spondylosis, leg pain, and dental pain. Percocet and MS Contin were prescribed, and plaintiff was referred for physical therapy. (Tr. 764-65, 780-82.)

On June 7, 2011, plaintiff visited Claire Oglander, MSW, LCSW, at Catholic Family Services. Plaintiff was assigned a GAF score of 60. (Tr. 793.) On June 14, 2011, plaintiff failed to appear for a scheduled appointment with Ms. Oglander. (Tr. 792.)

On June 20, 2011, plaintiff reported to Ms. Oglander that her body ached and she was tired all of the time. Plaintiff expressed anger, and Ms. Oglander noted plaintiff to be stressed and overwhelmed. Ms. Oglander continued plaintiff in her GAF score of 60. (Tr. 791.) Plaintiff returned to Ms. Oglander on June 27, 2011, who noted plaintiff not to be making any improvement. (Tr. 790.)

On July 20, 2011, plaintiff cancelled a scheduled appointment with Ms. Oglander. (Tr. 789.) On July 27, 2011, Ms. Oglander noted plaintiff not to be making any improvement. Plaintiff's GAF score remained at 60. (Tr. 788.)

On August 3 and August 10, 2011, Ms. Oglander noted plaintiff to be making slight improvement. Plaintiff continued in her GAF score of 60. (Tr. 787.)

On August 17, 2011, plaintiff reported to Ms. Oglander that she felt overwhelmed and scared. Plaintiff reported that she

could not perform simple housekeeping and that she had no help. Plaintiff was noted to continue to make slight improvement. (Tr. 785.)

In a letter addressed to "To Whom it May Concern" dated August 23, 2011, Ms. Oglander wrote:

> It is my professional opinion that any work Ms. Becker engages in may have a deleterious effect on her mental health. Ms. Becker's physical limitations, coupled with the stress she is experiencing raising three young grandchildren due to the sudden death of her daughter, may overwhelm Ms. Becker. Ms. Becker currently suffers from depression and anxiety and more stress may exacerbate her mental condition.

(Tr. 784.)

In a letter addressed to "To Whom it May Concern" dated August 23, 2011, Dr. Kasalova wrote that plaintiff "has not had any medical evaluation or treatment for substance abuse" and that the diagnosis of such had been removed from her record. (Tr. 759.)

## IV. ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social Security Act through December 31, 2014. The ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, January 1, 2009. The ALJ found plaintiff's possible left-side carpal tunnel syndrome, lumbar spondylosis, cervical disc bulging, obstructive ventilatory defect, allegations of headaches and knee pain, and bipolar affective

disorder to constitute severe impairments, but that plaintiff did not have an impairment or combination of impairments which met or medically equaled an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 9-13.) The ALJ found plaintiff to have the RFC to

> occasionally lift 20 pounds, frequently lift 10 pounds, sit or stand six hours out of an eight-hour work day, and stand six hours out of an eight-hour work day. The claimant is able to understand, remember, and carry out at least simple instructions and non-detailed tasks up to and including semi-skilled work at the specific vocational preference [SVP] level of three. Additionally, the claimant should not work in a setting which includes constant/ regular contact with the general public and should not perform work which includes more than infrequent handling of customer complaints.

(Tr. 13.)

The ALJ found plaintiff able to perform her past relevant work as a merchandiser and house cleaner. The ALJ also determined that, considering plaintiff's age, education, work experience, and RFC, vocational expert testimony supported an alternative finding that plaintiff was able to perform other work as it exists in the national economy, and specifically, dishwasher, assembler and packager. The ALJ thus determined plaintiff not to be under a disability at any time from January 1, 2009, through the date of the decision. (Tr. 13-20.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or

- 41 -

combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal

quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the

record could also have supported an opposite decision." <u>Weikert v.
Sullivan</u>, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation
marks and citation omitted); <u>see also</u> <u>Jones ex rel. Morris v.
Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

The Court now turns to plaintiff's specific challenges to
the Commissioner's final decision.

A.    <u>Step 2 Analysis of Severe Impairments</u>

At Step 2 of the sequential evaluation, the ALJ decides
whether the claimant has a severe impairment or combination of
impairments, meaning that which significantly limits her ability to
do basic work activities.[30]  Plaintiff contends that the ALJ erred
by effectively failing to find plaintiff's allegations of headaches
and knee impairments to constitute severe impairments at Step 2 of
the analysis, and further erred in failing to find chronic pain
syndrome to be a severe impairment.  The Court addresses each of
these contentions in turn.

1.    *Headaches and Knee Impairments*

In her written decision, the ALJ stated at Step 2 of the
sequential analysis that plaintiff's severe impairments included

---

[30]The ability to do most work activities encompasses "the
abilities and aptitudes necessary to do most jobs." <u>Williams v.
Sullivan</u>, 960 F.2d 86, 88 (8th Cir. 1992).  Examples include
physical functions such as walking, sitting, standing, lifting,
pushing, pulling, reaching, carrying, or handling; capacities for
seeing, hearing and speaking; understanding, carrying out and
remembering simple instructions; use of judgment; responding
appropriately to supervision, co-workers and usual work situations;
and dealing with changes in a routine work situation.  <u>Id.</u> at 88-
89.

"allegations of headaches and knee impairments[.]" (Tr. 12.) In determining plaintiff's RFC at Step 4 of the analysis, however, the ALJ found there to be no objective medical records to support plaintiff's claim that "these impairments are a part of her *disabling* combination of impairments." (Tr. 15.) (Emphasis added.) Plaintiff contends that these two findings are inconsistent and show the ALJ to have effectively considered plaintiff's headaches and knee impairments not to constitute severe impairments at Step 2.

In Lacroix v. Barnhart, 465 F.3d 881 (8th Cir. 2006), the claimant made a similar argument, that is, that the ALJ's Step 4 RFC analysis was inconsistent with the earlier determination made at Step 2 that plaintiff's impairments significantly limited her functional abilities. The Eighth Circuit soundly rejected this argument inasmuch as "[e]ach step in the disability determination entails a separate analysis and legal standard." Id. at 888 n.3. Because plaintiff bases her argument on a contention that the ALJ's analysis as to her headaches and knee impairments is inconsistent between Step 2 and Step 4 of the sequential analysis, her argument must be rejected on the basis of the Eighth Circuit's reasoning in Lacroix.

2. *Chronic Pain Syndrome*

Plaintiff also contends that the ALJ erred by failing to find plaintiff's chronic pain syndrome to be a severe impairment at Step 2 of the analysis. In response, the Commissioner argues that

the ALJ did not err inasmuch as plaintiff failed to claim or testify that chronic pain syndrome was a basis for her alleged disability.  Instead, the Commissioner argues, plaintiff attributed her pain to fibromyalgia.  Notably, the ALJ likewise did not consider plaintiff's fibromyalgia to be a severe impairment at Step 2.  For the following reasons, the ALJ erred in her analysis and the matter should be remanded for further proceedings.

The undersigned is aware that, as a general rule, "an ALJ has no 'obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability[.]'" <u>Battles v. Shalala</u>, 36 F.3d 43, 45 n.2 (8th Cir. 1994) (quoting <u>Brockman v. Sullivan</u>, 987 F.2d 1344, 1348 (8th Cir. 1993)).  An exception to this rule exists, however, where the evidence of record puts the ALJ on notice of the need for further inquiry.  <u>Id.</u>  This assessment must be made on a case-by-case basis.  <u>Mouser v. Astrue</u>, 545 F.3d 634, 639 (8th Cir. 2008) (citing <u>Battles</u>, 36 F.3d at 45).

The record here is replete with evidence of the existence of plaintiff's chronic pain, including plaintiff's testimony; consistent complaints of chronic pain to treating physicians and specialists; observations and diagnoses of chronic pain made by treating physicians and specialists; and continued and increasing use of significant narcotic pain medications, including morphine, hydrocodone and oxycodone, prescribed specifically for plaintiff's chronic pain condition.  In addition, a review of the record shows

that on numerous occasions, physicians suggested that plaintiff's perception of such severe and chronic pain may be related to her mental impairment(s). Indeed, Dr. Gray, plaintiff's treating physician who ultimately became plaintiff's pain specialist, opined in December 2009 that plaintiff's "chronic pain syndrome" was disabling more from a psychiatric standpoint than a physical one. The ALJ's decision, however, is silent as to these significant observations, diagnoses and treatment regimens for plaintiff's chronic pain. Given this substantial and documented evidence, the question of plaintiff's chronic pain and chronic pain syndrome was squarely before the ALJ, obligating her to investigate these impairments further before evaluating plaintiff's RFC. Gasaway v. Apfel, 187 F.3d 840, 843 (8th Cir. 1999). The ALJ erred by failing to do so.

Upon remand, the Commissioner shall obtain a psychiatric or psychological evaluation to fully evaluate plaintiff's mental impairments as they relate to plaintiff's diagnosed condition of chronic pain and determine whether her complaints of pain are psychological in origin. Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985). Such evaluation may be made by recontacting plaintiff's treating psychiatrist or by ordering a consultative examination. In addition, although the Commissioner acknowledges that plaintiff attributed her pain to fibromyalgia and not chronic pain syndrome, the undersigned notes the ALJ to have nevertheless dismissed plaintiff's diagnosed and longstanding impairment of

fibromyalgia in a cursory manner "[g]iven the absence of any notations regarding how it was concluded that the claimant had fibromyalgia[.]" (Tr. 15.) A review of this determination shows the ALJ to have improperly substituted her own conclusions regarding the existence of this medical condition for the express diagnoses of treating physicians. In such circumstances, an ALJ commits "egregious error." Delrosa v. Sullivan, 922 F.2d 480, 484-85 (8th Cir. 1991). If an ALJ questions the existence of a claimant's diagnosed condition, the ALJ must, at a minimum, order a consultative examination so that she may make an informed decision. Id. at 485.

B.    RFC Determination

       Because the ALJ failed to consider substantial evidence demonstrating the existence of chronic pain syndrome and fibromyalgia and failed to fully and fairly develop the record as to the effect of such impairments on plaintiff's ability to perform work, it cannot be said that the ALJ's RFC determination is supported by substantial evidence on the record as a whole. See generally Garza v. Barnhart, 397 F.3d 1087 (8th Cir. 2005) (per curiam). This cause must therefore be remanded to the Commissioner for further development of the record as to plaintiff's chronic pain syndrome and fibromyalgia; for reconsideration of whether such impairments constitute severe impairments; and for appropriate consideration as to what effect, if any, such impairments have upon plaintiff's RFC when considered in combination with plaintiff's

other impairments.

Accordingly, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that Acting Commissioner of Social Security Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as defendant in this cause.

**IT IS FURTHER ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED,** and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion. Because the current record does not conclusively demonstrate that plaintiff is entitled to benefits, it would be inappropriate for the Court to award plaintiff such benefits at this time.

Judgment shall be entered accordingly.

_____
UNITED STATES MAGISTRATE JUDGE

Dated this _23rd_ day of September, 2013.